IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PATRICIA ANN DIMMITT,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>UTAH TRANSIT AUTHORITY,<br>Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:03-CV-1016-TC |

This matter comes before the court on the parties' cross-motions for summary judgment

on Plaintiff Patricia Ann Dimmitt's sole cause of action under Title VII, 42 U.S.C. § 2000e-3(a),[1]

against her former employer Defendant Utah Transit Authority ("UTA") for alleged retaliatory

discharge in violation of her civil rights.  Ms. Dimmitt claims that UTA terminated her

employment in retaliation for complaining to UTA's Civil Rights Manager that she was being

discriminated against because of her gender.[2]  UTA contends that it terminated Ms. Dimmitt's

employment based on a legitimate non-discriminatory reason (i.e., that Ms. Dimmitt engaged in a

---

[1]This section of Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter [entitled "Equal Employment Opportunities"], or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

[2]Ms. Dimmitt's Complaint requested punitive damages, which UTA has opposed on the basis that such damages against the UTA are barred by state and federal law.  The court need not reach the issue because Ms. Dimmitt has conceded the point.  (See Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Opp'n Mem."] at 21.)

disruptive and unprofessional pattern of contentious and confrontational behavior in the workplace).

For the reasons set forth below, Ms. Dimmitt's Motion For Summary Judgment is DENIED and UTA's Motion for Summary Judgment is GRANTED.

## FACTUAL BACKGROUND[3]

Patricia Dimmitt was employed by the UTA as an office coordinator in the Community Relations Department from July 9, 2001, to July 12, 2002, when she was discharged from her job. The parties dispute the reasons for Ms. Dimmitt's discharge from employment.[4]  Ms. Dimmitt asserts that she was fired in retaliation for filing a gender discrimination complaint with the UTA's Civil Rights Manager on May 30, 2002.  UTA contends that Ms. Dimmitt's employment was terminated "due to a pattern of confrontational and divisive behavior by Ms. Dimmitt that poisoned the working atmosphere in her department and needlessly diverted [her co-workers] from their work."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 26.)  UTA contends that five incidents occurring between May 21, 2002, and June 28, 2002, led to UTA's decision to discharge Ms. Dimmitt on July 12, 2002, and that Ms. Dimmitt's discrimination complaint on May 30, 2002, had nothing to do with UTA's decision.

Ms. Dimmitt's duties as office coordinator were largely in a secretarial or support capacity.  She provided clerical support for the professional staff in the Community Relations Department, acted as a receptionist and answered the telephone, ordered supplies, and handled

---

[3]Only the facts necessary to the court's analysis will be set forth here.  For a more detailed account of the facts of this case, see the parties' briefs.

[4]But the court finds that none of the purported factual disputes are either genuine or material, as will be noted throughout this Order.

certain accounts payable tasks for the department.

The Community Relations Department where Ms. Dimmitt worked was encompassed by a larger department called UTA's Communications Department. Although the Communications Department had a director, Ms. Carole Verschoor, the manager of the Community Relations Department, Andrea Packer, acted as Ms. Dimmitt's supervisor.[5] Only four employees reported directly to Ms. Verschoor – namely, the managers of the departments within Communications (such as Andrea Packer, manager of the Community Relations Department) and Ms. Verschoor's executive assistant, Mr. Chris Shane. The managers of the departments within Communications were responsible for any necessary discipline of the employees that reported to them. Accordingly, Andrea Packer was responsible for any necessary discipline of Patricia Dimmitt.

Ms. Dimmitt was a non-exempt hourly employee who was generally expected to be present in the office from 8:30 a.m. to 5:00 p.m. each day, with one hour for lunch. All of the remaining members of the Community Relations Department, and the larger department that encompassed Community Relations (UTA's Communications Department) were exempt, salaried employees who were allowed more flexibility in their office hours. In other words, while still expected to work forty hours per week, they could vary their schedules. Ms. Dimmitt, as a non-exempt employee, did not have that flexibility.

---

[5]The parties discuss events that occurred before March 2002, when Andrea Packer was hired as the manager of the Community Relations Department. When Patricia Dimmitt was hired in July 2001, the manager's position was vacant and several members of the professional staff rotated through the position of acting manager for nine-week periods until March 2002. The relationship and communication between Ms. Dimmitt and her former managers are not relevant to the time period at issue here. Accordingly, the court does not consider those facts.

**May 21, 2002 Staff Meeting**

On May 21, 2002, during a Community Relations staff meeting attended by Ms. Dimmitt, Ms. Packer, and others, Ms. Packer discussed sending UTA employees to an upcoming conference of the American Public Transit Association ("APTA") in Las Vegas, Nevada.  Ms. Dimmitt became upset and frustrated with Ms. Packer because she believed that Ms. Packer was not considering her as a possible attendee at the Las Vegas meeting.  Ms. Dimmitt believed that two men were being considered for the opportunity to attend, which to her demonstrated her employer's alleged preference for men over women in the workplace.

Ms. Packer considered Ms. Dimmitt's conduct in the staff meeting to be a "blowup."  She observed that Ms. Dimmitt "suddenly became angry and raised her voice and essentially started yelling at me."[6]  (Packer Dep. at 86, attached as Ex. 4 to Def.'s Mem. Supp. Mot. Summ. J.)

Immediately following the staff meeting, Ms. Packer invited Ms. Dimmitt to come into Ms. Packer's office to talk about the incident.  Ms. Packer told Ms. Dimmitt that the manner in which she had raised her concerns was inappropriate.  According to Ms. Packer, Ms. Dimmitt committed to raise her concerns in a more appropriate and less confrontational way.[7]

---

[6]The parties do not dispute that Ms. Dimmitt expressed her frustration at the meeting. The testimony offered by Ms. Dimmitt that her behavior was not a "blowup" does not create a genuine dispute of material fact.  Ms. Dimmitt's characterization of her behavior is not relevant, because the legal standard requires the court to look at the employee's behavior from the decision maker's point of view.  See, e.g., Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000) ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."); Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("It is the perception of the decision maker which is relevant, not plaintiff's perception of herself.").

[7]Ms. Dimmitt did not recall whether she made such a commitment, but she agreed that she may have done so.  (See Dimmitt Dep. at 203, 206, attached as Ex. 2 to Def.'s Mem. Supp. Mot. Summ. J.)

4

**May 29, 2002 Staff Meeting**

During the following week's staff meeting on May 29, 2002, the APTA meeting was again discussed. Despite her commitment to Ms. Packer the prior week, Ms. Dimmitt again raised her voice and, according to Ms. Packer, again became upset in the meeting. Apparently Ms. Dimmitt was upset because she perceived that two allegedly similarly-situated men, Mr. Garcia and Mr. Shane, were going to get the opportunity to go to Las Vegas, while she was not.[8] Ms. Dimmitt complained about this, expressed her frustration, and said that she was considering talking with Toby Alires, UTA's Civil Rights Manager.[9] Ms. Packer perceived Ms. Dimmitt to be "very angry and upset" and viewed her actions in the meeting as a second inappropriate confrontation or "blowup." (Packer Dep. at 91-92.)

Following the incident, Ms. Packer contacted Bruce Cardon, the Human Resources Generalist assigned to her department, to discuss Ms. Dimmitt's behavior. In her deposition, Ms. Packer recalled "Bruce mentioning something to the effect that – another issue that was starting to come into play with respect to these blowups was the relationship a manager needed to have with their office coordinator, that I needed to be able to trust my office coordinator and we needed to have a good relationship and that these blowups directed at me were not conducive to that . . . ." (Packer Dep. at 121, attached as Ex. 1 to Def.'s Reply Mem.) Ms. Packer and Mr.

-----

[8] Ultimately, Jeanetta Williams was chosen to attend the APTA meeting. (Marti Money Decl., attached as Ex. 11 to Def.'s Mem. Supp. Mot. Summ. J., ¶ 9.)

[9] In her opposition brief, Ms. Dimmitt denies that the APTA meeting was discussed at the staff meeting and denies that she told Ms. Packer she was going to talk to UTA's Civil Rights Manager Toby Alires. (See Pl.'s Opp'n Mem. at XV.) But there is no genuine dispute of fact, because the only evidence Ms. Dimmitt produces is her deposition testimony stating that she cannot remember what happened. (See Def.'s Reply Mem. at xviii.)

Cardon met with Ms. Dimmitt the next day to discuss Ms. Dimmitt's behavior and her concerns. Ms. Packer testified: "We talked about my concerns about her blowing up at me like that in staff meeting in front of other employees . . . and – but I expressed to her that blowing up at me in staff meeting like that is not appropriate and that I would expect her not to do it again." (Id. at 120.)

**May 30, 2002 Discrimination Complaint by Ms. Dimmitt**

On May 30, 2002, Ms. Dimmitt met with Toby Alires, UTA's Civil Rights Manager, to complain about "preferential treatment within the department of two males." (Dimmitt Dep. at 132.) Mr. Alires took notes during the meeting and typed them up afterwards for the file. (See Ex. H attached to Pl.'s Opp'n Mem. at UTA0071-72; Ex. I attached to Pl.'s Opp'n Mem. at UTA00402.) He later typed up another version for presentation at the July 10, 2002 General Managers' Civil Rights Committee meeting. (See Ex. B attached to Pl.'s Reply Mem. in Supp. of Mot. for Summ. J. at UTA00456 ("A staff employee is alleging that a co-worker is doing personal work for a Director on UTA time. This issue has been forwarded to Human Resources.").) In a final draft of the minutes, written by Mr. Alires after Ms. Dimmitt was terminated, a notation ("This is not a civil rights issue") was added regarding Ms. Dimmitt's complaint. "A staff employee is alleging that a co-worker is doing personal work for a Director on UTA time. This is not a civil rights issue. This issue has been forwarded to Human Resources." (Id. at UTA00410 (emphasis added).)

**June 6, 2002 Incident between Ms. Dimmitt and Julie Bond**

During 2002, UTA formed a Transit Information Exchange Committee ("TIE Committee") co-chaired by Julie Bond, a Rideshare Marketing Specialist employed in UTA's

Marketing Department.  Ms. Dimmitt was also a member of the TIE Committee.

On June 6, 2002, following a TIE Committee meeting, Ms. Dimmitt approached Ms. Bond in Ms. Bond's work area in another part of the UTA building.  Ms. Dimmitt approached Ms. Bond because Ms. Dimmitt was offended by a comment that she understood Ms. Bond to have made in the TIE Committee meeting.  Ms. Dimmitt understood that the comment was directed to the TIE Committee as a whole, not to Ms. Dimmitt individually.  Nonetheless, Ms. Dimmitt took it upon herself to approach Ms. Bond.  No other member of the TIE Committee approached Ms. Bond concerning the comment.  While Ms. Dimmitt denies using profanity or yelling at Ms. Bond, she admits to raising her voice with Ms. Bond.

Due to the way that Ms. Dimmitt was acting, Ms. Bond asked Ms. Dimmitt to move the conversation into a conference room.  Ms. Bond considered Ms. Dimmitt's behavior to be very confrontational and "in her face."  (Julie Bond Decl., attached as Ex. 12 to Def.'s Mem. Supp. Mot. Summ. J., ¶ 5.)  Ms. Bond considered Ms. Dimmitt's conduct to be abusive, unprofessional, and inappropriate.  Immediately after Ms. Dimmitt confronted Ms. Bond, Ms. Bond contacted the Human Resources and Community Relations Departments to report the incident and Ms. Dimmitt's behavior.

Mr. Cardon and Ms. Packer, who were concerned about the matter, investigated the incident and spoke to Ms. Bond and Ms. Dimmitt, among others.  Mr. Cardon recalled that there were "two phases to the discussion with [Ms. Dimmitt].  One was to understand from her perspective what happened, and the other was to, in conjunction with [Ms. Packer], the manager, to let her know that it was inappropriate. . . . [W]e gave her a warning that that behavior was inappropriate in the workplace and would not be tolerated, that if it continued, there would be . . .

discipline for it." (Bruce Cardon Dep., attached as Ex. 9 to Def.'s Mem. Supp. Mot. Summ. J., at 61.)  After the meeting with Ms. Dimmitt, Ms. Packer expressed to Mr. Cardon her increasing frustration with Ms. Dimmitt's confrontational behavior and stated that she felt that the problem was getting worse, not better.

**June 2002 "Gas Key Incident" between Ms. Dimmitt and Kris McBride**

During the second week in June 2002, Ms. Dimmitt had another disagreement[10] with a member of the Community Relations professional staff, Kris McBride.  Ms. Dimmitt, who kept gas keys for vehicles assigned to the Community Relations Department, quarreled with Mr. McBride regarding his access to a gas key.  "He needed a gas key. [Ms. Dimmitt] wouldn't give him one. . . . She admitted that there had been a confrontation.  Something about Kris always losing the keys.  She felt a responsibility to keep track of them[.]" (Packer Dep. at 105-06.)

Ms. Packer learned of the quarrel from another member of the department.  She talked to Ms. Dimmitt and Mr. McBride.  In her conversation with Ms. Dimmitt, Ms. Packer told Ms. Dimmitt that her argument with Mr. McBride was an unnecessary confrontation and that, as office coordinator, her job was to help the professional staff get their work done and "make things accessible and provide for them, not hinder them." (Id. at 106.)  Afterwards, Ms. Packer told Mr. Cardon, the Department's Human Resources Generalist, about the incident.

---

[10]Ms. Dimmitt attempts to create a factual dispute by suggesting that no disagreement took place.  The court is not persuaded.  The record supports the opposite conclusion.  (See, e.g., Def.'s Reply Mem. at xxv-xxvii (noting that Ms. Dimmitt's admission to Ms. Packer that there was a confrontation was uncontroverted in the record and noting that the fact that Ms. Dimmitt and Mr. McBride later resolved the issue is irrelevant because it does not mean the confrontation did not occur).)

**June 28, 2002 Incident between Ms. Dimmitt and Chris Shane**

There was also tension between Ms. Dimmitt and Chris Shane, an employee in the Community Relations Department.  Ms. Packer testified that Mr. Shane seemed uncomfortable in the Community Relations office due to the tension.

On Friday, June 28, 2002, Mr. Shane, whose cubicle was next to Ms. Dimmitt's, arrived at the office to overhear her talking about him on the telephone.  Mr. Shane asked Ms. Dimmitt whom she was speaking to but Ms. Dimmitt refused to tell him.  Mr. Shane felt sufficiently uncomfortable after this encounter with Ms. Dimmitt that he obtained approval to work in a different part of the building for part of the day in order to avoid being around Ms. Dimmitt.

Ms. Packer, who had been out of the office that day, learned of the problem when she returned the following Monday.  After Ms. Packer spoke to Ms. Dimmitt about it, Ms. Packer contacted Bruce Cardon and told him about the encounter between Ms. Dimmitt and Mr. Shane.  She expressed her concern at the disruption and disharmony in the office and her perception that Ms. Dimmitt was not responding to Ms. Packer's instruction to end the confrontations and conflict with other employees.

**July 12, 2002 Termination of Ms. Dimmitt's Employment**

On July 8, 2002, Carole Verschoor (Ms. Packer's supervisor), who had been out of the office for approximately two weeks, returned.  Upon Ms. Verschoor's return, Ms. Packer explained to her the incidents between Ms. Dimmitt and Chris Shane and Kris McBride.  Ms. Packer viewed these incidents as a continuing pattern of behavior by Ms. Dimmitt in which Ms. Dimmitt was confrontational with other employees, committed to curb such behavior, but then failed to abide by her commitments.  Ms. Packer told Ms. Verschoor that, as a result of these

9

Case 2:03-cv-01016-TC   Document 54   Filed 09/26/05   Page 10 of 20

incidents, the working environment within the Community Relations Department had become very tense and uncomfortable. She told Ms. Verschoor that she had been working with Bruce Cardon on these issues, that she had serious concerns, and that she and Mr. Cardon had discussed terminating Ms. Dimmitt's employment.

UTA contends that Ms. Packer alone made the decision to fire Ms. Dimmitt. Ms. Dimmitt contends that Carole Verschoor and Andrea Packer made the decision together, and that their motivation was not Ms. Dimmitt's performance but rather retaliation for Ms. Dimmitt's complaint about alleged gender discrimination and her report to Toby Alires that Chris Shane was doing personal favors for Ms. Verschoor during business hours (i.e., taking care of Ms. Verschoor's house while she was away on vacation).

Ms. Dimmitt's attempt to create a genuine dispute of material fact on this issue through innuendo[11] is unconvincing. Ms. Dimmitt testified that she had no idea who made the decision to terminate her employment with UTA (Dimmitt Dep. at 280-81), yet she points to the following facts to support her position that Ms. Verschoor in concert with Ms. Packer made the decision to discharge Ms. Dimmitt: (1) Ms. Verschoor hired Ms. Packer and played a key role in deciding Ms. Packer's bonus;[12] (2) Ms. Verschoor and Ms. Packer had an excellent working relationship;

---

[11]Even taking the facts in a light most favorable to Ms. Dimmitt, the inference she attempts to build is questionable and does not create a genuine dispute of material fact. Indeed, the fact that Ms. Verschoor and Ms. Packer spoke to the head of UTA, John Inglish, and Bruce Cardon, the Human Resources Generalist, before Ms. Dimmitt's employment was terminated suggests that the decision to fire Ms. Dimmitt was a carefully thought out decision rather than a conspiratorial agreement between Ms. Verschoor and Ms. Packer.

[12]Ms. Dimmitt contends that, as a result of Ms. Packer's relationship with Ms. Verschoor, Ms. Packer was "beholden" (Pl.'s Opp'n Mem. at 20) to Ms. Verschoor. Ms. Dimmitt suggests that from these facts the court should infer that Ms. Packer would fire an employee either as a favor to Ms. Verschoor or to protect her job and bonus. The court finds such an inference

(3) Ms. Packer always consulted with Ms. Verschoor before making personnel decisions; and

(4) Ms. Dimmitt was fired within days of the date that Ms. Verschoor learned about Ms.

Dimmitt's remark to Toby Alires about Mr. Shane doing personal favors for Ms. Verschoor.[13]

But Ms. Packer, Ms. Verschoor,[14] and Mr. Cardon all testify that Ms. Packer made the decision

alone.  Ms. Dimmitt's circumstantial evidence does not contradict the direct testimony of Ms.

Packer, Ms. Verschoor, and Mr. Cardon (particularly in light of Ms. Dimmitt's own testimony

that she does not know who made the decision to fire her), and it does not support her conclusion

that Ms. Packer and Ms. Verschoor together made the decision to terminate Ms. Dimmitt's

employment.  The inference Ms. Dimmitt attempts to establish is too tenuous, and the court finds

that, based on the record, there is no genuine dispute that Ms. Packer alone made the decision to

fire Ms. Dimmitt.

---

untenable, particularly given the lack of evidence in the record supporting such an inference.

[13]UTA points out that Mr. Alires first learned of the reasons for Mr. Shane's absence from another employee (Andy Gallegos).  Ms. Dimmitt simply confirmed what Mr. Alires had already been told by Mr. Gallegos.  (See Def.'s Mem. Supp. Mot. For Summ. J. at 21, ¶ 91).  In any event, Ms. Dimmitt asserts that her statement to Mr. Alires (that Chris Shane was taking care of Ms. Verschoor's house during business hours) "implicated" Ms. Verschoor in "wrong-doing" (Pl.'s Opp'n Mem. at 20) and that such statement prompted Ms. Verschoor to retaliate against Ms. Dimmitt.  There is no evidence that Ms. Verschoor told Mr. Shane he could take time off from his job to tend to her house while she was on vacation.  The record shows only that she requested that he help her while she was out of town and that he actually did some of the chores on company time.  Accordingly, it is unclear what Ms. Dimmitt means by "wrong-doing," unless she is suggesting that "allowing" an individual to take out garbage cans, bring in the mail, and other similar tasks is somehow preferential treatment, which the court finds difficult to accept.

[14]Ms. Dimmitt says that, "[i]n light of the relationship between Ms. Verschoor and Ms. Packer, however, and the fact that Ms. Verschoor learned that Ms. Dimmitt had implicated her in wrong-doing four days before [Ms. Dimmitt's] termination, Ms. Verschoor's story is simply not believable." (Pl.'s Opp'n Mem. at 20.)  The court may not make credibility determinations at the summary judgment stage.

11

On July 12, 2002, Ms. Packer and Mr. Cardon met with Ms. Dimmitt and informed her of Ms. Packer's decision to terminate her employment.  Ms. Packer testified that she "terminated [Ms. Dimmitt] for a series of incidents with several employees over a period of just a few weeks that [Ms. Packer] felt were inappropriate, that [they] had spoken about, that [Ms. Dimmitt] agreed to not do again.  It was disruptive to the office and was jeopardizing [Ms. Packer's] relationship and ability to work with [Ms. Dimmitt]."  (Packer Dep. at 149.)

After Ms. Dimmitt was fired, Mr. Cardon sent Mr. Alires an email alerting Mr. Alires of the fact.  Mr. Alires testified in his deposition that after he received the email, he spoke to Bruce Cardon and expressed some concern.  Mr. Alires testified: "I asked [Mr. Cardon] – 'I received the E-mail.  What's the reason for termination?'  He told me there were some performance issues with Patty [Ms. Dimmitt], and I told him, 'You know, this is real close to that filing of the complaint [presumably Mr. Alires is referring to Ms. Dimmitt's gender discrimination complaint].  This has nothing to do with it.'  And [Mr. Cardon] told me no.  He mentioned two specific issues in which Patty had [verbally] attacked Andrea [Packer] in some staff meeting that [Ms. Packer] considered to be insubordinate."  (Alires Dep. at 70.)  When Mr. Alires was asked at his deposition whether Mr. Cardon raised anything else, Mr. Alires replied, "He said performance issues, but he didn't get into them."  (Id.)

After Ms. Dimmitt was discharged from her employment at the UTA, she filed this suit.

12

## ANALYSIS

### Legal Standard

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56©;  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  Applied Genetics Int'l, Inc. v. First Affiliatory Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  In the case of cross-motions for summary judgment, the court must "construe all inferences in favor of the party against whom the motion under consideration is made," in this case, Ms. Dimmitt. Pirkheim v. First Unum Life Ins., 229 F.3d 1008, 1010 (10th Cir. 2000); American Inv. Fin. v. United States, 364 F. Supp. 2d 1321, 1323-24 (D. Utah 2005) (citing Pirkheim).  But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  Liberty Lobby, 477 U.S. at 252.  See also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

### Ms. Dimmitt's Title VII Retaliatory Discharge Claim

Ms. Dimmitt alleges that she was fired on July 12, 2002, in retaliation for her May 30, 2002 complaint to Toby Alires, the UTA Civil Rights Manager, regarding discrimination on the

13

basis of gender, and her complaint regarding Chris Shane.  Under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any

of his employees . . . because he has opposed any practice made an unlawful employment

practice by this subchapter [42 U.S.C. §§ 2000e – 2000e-17]."

    For Title VII retaliation claims at issue in the summary judgment context, where there is

no direct evidence of retaliation (as is the case here), the Tenth Circuit uses the three-part burden-

shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

See, e.g., Tran v. Trustees of State Colleges in Colo., 355 F.3d 1263, 1266 (10th Cir. 2004)

(considering Title VII retaliation claim under McDonnell Douglas burden-shifting framework);

Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004) (noting that Title VII retaliation case

with no direct evidence of retaliation is analyzed under McDonnell Douglas burden-shifting

framework);  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000)

("the three-part McDonnell Douglas burden-shifting analysis is limited to the summary judgment

context").

    Under the McDonnell Douglas three-part test, Ms. Dimmitt initially has the burden of

establishing a *prima facie* case of retaliation.  If she satisfies that initial burden, then the burden

of production[15] shifts to UTA to articulate a facially legitimate, nondiscriminatory reason for Ms.

Dimmitt's discharge.  If UTA meets its burden of production, Ms. Dimmitt must show that there

is a genuine dispute of material fact regarding whether the reasons provided by UTA for the

---

    [15]UTA only has a burden of production, not persuasion.  Reeves v. Sanderson, 530 U.S.
133, 142 (2000) (evaluating burden "'can involve no credibility assessment.'") (internal citation
omitted).

adverse employment action are pretextual. Tran, 355 F.3d at 1266-67; Kendrick, 220 F.3d at 1226.

**Has Ms. Dimmitt Established a *Prima Facie* Case?**

For purposes of analysis, the court assumes, without deciding, that Ms. Dimmitt has established a *prima facie* case of retaliation.  Instead, the court focuses on the McDonnell Douglas test's second and third prongs (legitimate nondiscriminatory reason and pretext).

**Has UTA Articulated a Facially Legitimate, Nondiscriminatory Reason for Ms. Dimmitt's Discharge?**

To establish a legitimate, nondiscriminatory reason, UTA "need not prove the 'absence of retaliatory motive, but only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason.'" Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982) (quoting Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980)).  According to the UTA, "Andrea Packer terminated Ms. Dimmitt's employment due to a pattern of confrontational and divisive behavior by Ms. Dimmitt that poisoned the working atmosphere in her department and needlessly diverted [her co-workers] from their work."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 26.)  Based on a review of the record, the court finds that UTA has met its burden of production by providing evidence of a legitimate, nondiscriminatory reason for its discharge of Ms. Dimmitt.  See, e.g., Burrus, 683 F.2d at 344 (noting plaintiff's "continuing attitudinal problems and her inability to work with fellow employees" was a legitimate, nondiscriminatory reason).[16]  Accordingly, the burden shifts back to Ms. Dimmitt to

---

[16]See also Monteiro v. Poole Silver Co., 615 F.2d 4, 9 (1st Cir. 1980) (stating that volatile and insubordinate behavior by employee is adequate basis for termination); Joshi v. Professional Health Servs., Inc., 606 F. Supp. 302, 308 (D.D.C. 1985) (concluding that potential employer's

show a genuine issue of material fact regarding pretext.

**Has Ms. Dimmitt Established a Genuine Issue of Material fact Regarding Pretext?**

A pretextual reason is one "unworthy of belief." Kendrick, 220 F.3d at 1230.  Ms.

Dimmitt may show pretext by providing evidence of "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v.

Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal citations omitted).  "[A] challenge of

pretext requires us to look at the facts as they appear to the person making the decision to

terminate plaintiff." Kendrick, 220 F.3d at 1231. See also Branson v. Price River Coal Co., 853

F.2d 768, 772 (10th Cir. 1988) ("It is the perception of the decision maker which is relevant, not

plaintiff's perception of herself.").

Ms. Dimmitt cites to various facts in the record to support her argument that UTA's

reason for firing Ms. Dimmitt was pretextual.

First, she contends that she was fired within days of filing her gender discrimination

complaint with Mr. Alires and within days of reporting that Chris Shane was doing personal

favors for Carole Verschoor on UTA time.  Temporal proximity alone is insufficient to raise an

issue of fact regarding pretext. Annett v. University of Kan., 371 F.3d 1233, 1240-41 (10th Cir.

2004) ("Allowing 'very close' temporal proximity to operate as a proxy for [the more

_____

conclusion that plaintiff was incompatible, uncooperative, and disruptive force was valid
motive); McCarthy v. Cortland County Community Action Program, Inc., 487 F. Supp. 333, 342
(N.D.N.Y. 1980) (holding that plaintiff's personal conflicts with other employees sufficient basis
for termination).

demanding] evidentiary requirement [at the pretext analysis stage] would not further the

substantive purposes of our inquiry at [the pretext analysis] stage.").  The question is whether the

temporal proximity in combination with other evidence and argument presented by Ms. Dimmitt

is sufficient to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions" in the UTA's proffered reasons for firing Ms. Dimmitt such that "a reasonable

factfinder could rationally find them unworthy of credence."  Anderson, 181 F.3d at 1179;

Annett, 371 F.3d at 1241.

Ms. Dimmitt points to evidence in the record regarding an exchange between Mr. Alires

and Mr. Cardon concerning the UTA's discharge of Ms. Dimmitt within close proximity of the

dates of her complaints.  Mr. Alires, upon receiving an email from Bruce Cardon telling him that

Ms. Dimmitt's employment had been terminated, expressed concern that the termination was

retaliatory because he said "you know this is real close to that filing of the complaint." (Alires

Dep. at 70, attached as Ex. 9 to Def.'s Reply Mem.)  Mr. Cardon told Mr. Alires that the

complaint had nothing to do with Ms. Dimmitt's discharge.  Ms. Dimmitt finds suspicious the

fact that Mr. Cardon's explanation to Mr. Alires included a mention of "performance issues,"

which Ms. Dimmitt contends were never cited by Ms. Packer as reasons for discharge.  The

record does not elaborate on what he meant by "performance issues."  This phrase is simply too

vague to give it the sinister meaning Ms. Dimmitt asks the court to give it (i.e., that Mr. Cardon

lied to cover up the purported fact that Ms. Dimmitt's discharge was connected to her

complaint).

Ms. Dimmitt claims that "policies and procedures were not followed in the case of Ms.

Dimmitt.  None of the alleged incidents were documented in any form by her supervisor."  (Pl.'s

17

Opp'n Mem. ¶ 101 (citing to Packer Dep. at 113).)  First, the testimony on page 113 of Ms.

Packer's deposition transcript does not support the proposition for which it is cited.  Even if there

is evidence in the record to support the proposition, the real issue is whether Ms. Dimmitt was

treated differently than similarly situated employees.[17]  As noted below, the court finds that Ms.

Dimmitt has not established evidence to support such a contention.

Ms. Dimmitt points to differences in the minutes Mr. Alires drafted for the July 10, 2002

General Managers' Civil Rights Committee meeting and the final draft of those minutes, released

after the meeting.  She argues that the notes were "sanitized" by Mr. Alires after Ms. Dimmitt

was discharged to make Ms. Dimmitt's purported gender discrimination complaint look as if it

were not a civil rights complaint.  Having considered the convoluted explanation Ms. Dimmitt

presents to support her position, the content of Ms. Dimmitt's complaint to Mr. Alires (as

reflected in Mr. Alires' contemporaneous handwritten notes), the two versions of the meeting

minutes, Ms. Dimmitt's testimony, and Mr. Alires' deposition testimony (that he did not believe

this was a civil rights matter), the court finds that a reasonable jury could not find that the

contents of Mr. Alires' documents cast doubt on the UTA's reasons for discharging Ms. Dimmitt

from her job.

Finally, Ms. Dimmitt claims she was not treated equally (that is, the UTA's handling of

her male co-workers' performance issues was much more lenient).  Ms. Dimmitt specifically

points to the treatment of Kris McBride and Chris Shane.  A plaintiff may establish pretext "with

evidence that the defendant acted contrary to an unwritten policy or contrary to company practice

---

[17]There is no evidence in the record of a formal policy regarding treatment of employees
prior to discharge.

when making the adverse employment decision affecting the plaintiff.  A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was <u>treated differently from other similarly-situated employees who violated work rules of comparable seriousness</u>."  <u>Kendrick</u>, 220 F.3d at 1230 (internal citations omitted) (emphasis added).  An employee is similarly situated if "the employee deals with the <u>same supervisor</u> and is subject to the '<u>same standards governing performance evaluation and discipline</u>.'  'A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.'" <u>Id.</u> at 1232 (internal citations omitted) (emphasis added).

Neither Kris McBride nor Chris Shane were similarly situated to Ms. Dimmitt.  Ms. Dimmitt was a non-exempt support or clerical employee under the supervision of Andrea Packer.  Mr. McBride was an exempt professional staff member.  Ms. Dimmitt's duties required her to be present at UTA to answer phones and perform her clerical duties, while Mr. McBride was UTA's media spokesperson, was on call at all hours, and was required to be out in the community.  As for Mr. Shane, he was supervised by Ms. Verschoor, not Ms. Packer, and he too was an exempt employee who was paid on a salaried basis, not by the hour.  Also, to the extent that Mr. Shane's supervisor had concern about Mr. Shane's performance or attendance, Mr. Shane's alleged absenteeism is not the same as Ms. Dimmitt's situation, in which her supervisor was concerned with Ms. Dimmitt's disruptive behavior in the office negatively affecting the office atmosphere and other employees' abilities to get their work done.

"[T]he mere existence of a scintilla of evidence in support of the nonmovant's position is

insufficient to create a dispute of fact that is 'genuine.'" <u>Lawmaster v. Ward</u>, 125 F.3d 1341,

1347 (10th Cir. 1997).  Even viewing the facts in a light favorable to Ms. Dimmitt, the court

finds that Ms. Dimmitt has not put forth evidence sufficient to create a genuine issue of material

fact on the issue of pretext.  There simply is not enough evidence in the record to raise a question

of fact concerning the alleged implausibility of UTA's reason for discharging Ms. Dimmitt.

Accordingly, her Title VII retaliation claim is dismissed.

## ORDER

For the foregoing reasons, Plaintiff Patricia Ann Dimmitt's Motion for Summary

Judgment is DENIED and Defendant UTA's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 21st day of September, 2005.

BY THE COURT:

TENA CAMPBELL
United States District Judge

20